IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,715






EX PARTE WILLIE MACK MODDEN, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM ANGELINA COUNTY






 Price, J., delivered the opinion of the Court, in which Meyers, Womack,
Johnson, Holcomb, and Cochran, JJ., joined. Keller, P.J., concurred in the
judgment. Hervey, J., filed a dissenting opinion, in which Keasler, J., joined.


O P I N I O N




 In his subsequent application for a writ of habeas corpus, the applicant claimed that
he is mentally retarded. We found that the applicant had met the requirements of Code of
Criminal Procedure Article 11.071, Section 5, and we remanded to the trial court for
findings of fact and conclusions of law. The trial court found that the applicant is retarded. 
Because the record supports the trial court's findings, we grant relief.


I. Procedural History


 The applicant was convicted of capital murder and sentenced to death in 1985. On
direct appeal, the conviction was affirmed. (1) In his initial application for habeas corpus
relief, we reversed the conviction for Penry error. (2) 

 The applicant was retried in 1992, and he was once again convicted and sentenced to
death. The conviction and sentence were affirmed on appeal. (3) We denied relief in the
applicant's initial writ application for this conviction. (4) He filed this subsequent writ
application after the United States Supreme Court began to consider, in Atkins v. Virginia,
whether the execution of mentally retarded people violates the Eighth Amendment to the
Constitution. We dismissed the application. The Supreme Court granted a stay of
execution, and nine days later, it delivered the opinion in Atkins, in which it held that
executing the mentally retarded violates the Eighth Amendment. (5) Later, the Supreme Court
granted the applicant's petition for a writ of certiorari, vacated our prior decision
dismissing his application, and remanded in light of its decision in Atkins. (6) We remanded
the case to the trial court to make findings and conclusions about whether the applicant is
mentally retarded.

 On remand, the State agreed and the trial court found that the applicant is mentally
retarded. (7) This finding was based on three reports in which three different mental health
experts concluded that the applicant is mentally retarded.

II. The Law


 The United States Supreme Court held in Atkins that, under evolving standards of
decency, the Eighth Amendment to the United States Constitution prohibits the execution
of people who are mentally retarded. (8) The Supreme Court cited with approval the
definitions set out by the American Association on Mental Retardation (AAMR) (9) and the
American Psychiatric Association (APA). (10) Basically, mental retardation is defined as (1)
significant subaverage general intellectual functioning, (2) concurrent with deficits in
adaptive functioning, (3) occurring before age 18.

 In the absence of legislative direction, we recently adopted those criteria, which are
consistent with the definition the legislature set out in Health and Safety Code Section
591.003(13). (11) In Ex parte Briseño, we concluded that the criteria in these definitions are
subjective, and thus, we set out some additional factors that factfinders may use. (12) We will
review the record and apply the criteria we adopted in Briseño.

III. The Record


 The first report in the record is from Dr. Joseph P. Kartye, Jr., a psychologist who
examined the applicant and testified during the1985 trial. The trial court admitted this
report during the 1985 trial. At the time, the applicant was 36 years old. As part of his
examination of the applicant, Kartye administered the Wechsler Adult Intelligence Scale. 
The applicant achieved a full scale I.Q. score of 64. He also administered the Wide Range
Achievement Test. The results showed that the applicant's reading, spelling, and arithmetic
abilities were at or below the third-grade level. Kartye concluded that the applicant's
intellectual deficits contributed directly to his inability to cope with life's day-to-day
demands: the applicant "lacks the cognitive and behavior controls necessary to regulate his
behavior." Kartye concluded, in essence, that the applicant is mildly mentally retarded. (13)

 The second report on which the trial court relied in concluding that the applicant is
mentally retarded was by Dr. Ernest Brownlee, Jr., a psychiatrist who examined the
applicant in 1988. Brownlee's report was admitted during the applicant's 1992 trial. 
According to the report, the applicant possesses an "extremely limited problem solving
ability." The applicant's memory is consistent with an organic brain disorder. Also, the
applicant is highly influenced by others, particularly his family. He said it is highly likely
that the applicant could not function outside of a structured setting and should be housed
either in a state school or at the Rusk State Hospital. Brownlee concluded that the
applicant is mildly mentally retarded.

 The third report on which the trial court based its conclusion was prepared by Dr.
Frankie Clark, a licensed psychologist who examined the applicant in 1992, and who
testified at the applicant's 1992 trial. The report was admitted into evidence during that
trial. Clark administered the Wechsler Adult Intelligence Scale (Revised), and the applicant
achieved a full scale I.Q. score of 58. Clark also administered the Wide Range
Achievement Test (Revised Level II), and in reading, spelling, and arithmetic the applicant's
abilities were at or below a third-grade level. 

 Regarding the applicant's adaptive functioning, Clark concluded that the applicant
possessed significant deficits. He possesses regressed and intellectually defective coping
skills; his approach to his environment is concrete; he is unable to interpret many abstract
stimuli; he has significant difficulties with interpersonal relationships; and he tends to
misinterpret or distort perceptual input from other people, which most likely is the cause
of his inability to make conventional or socially acceptable responses. Clark concluded
that the applicant is mildly retarded and that his thought processes and emotions appear to
show retardation in all areas. She also concluded that the applicant has been retarded since
birth.

 Clark also noted that the Texas Department of Criminal Justice (TDCJ) Mentally
Retarded Offender Program examined the applicant in 1989. The social assessment
performed at that time showed that the applicant possessed significantly subaverage
adaptive behavior with the condition being developmental in nature. School records that
Clark reviewed showed that the applicant was a slow learner with a speech defect. He
repeated the sixth grade, and completed school only through the seventh grade.

IV. Analysis


 As we explained above, the trial court used the criteria set out by the AAMR and the
APA. The trial court did not use the Briseño factors in its findings because it did not have
the benefit of our order in that case. Nonetheless, we conclude that the trial court's
findings are supported by the record. 

 This is not a case in which we have dueling experts. The three reports from the
mental health experts that the trial court considered are consistent with one another and
with the report from the TDCJ Mentally Retarded Offender Program. The reports establish
that the applicant has (1) significant subaverage general intellectual functioning, (2)
concurrent with deficits in adaptive functioning, (3) that occurred before age 18. The
applicant's IQ scores of 58 and 64 are well below the 70-75 score that generally indicates
subaverage general intellectual functioning. Clark found that the applicant possesses
deficits in several adaptive functioning categories, and she found that the applicant has been
retarded since birth. 

 The claim that the parties litigated the applicant's mental retardation claim during
the 1992 trial is incorrect. Although evidence was admitted on the issue of mental
retardation, there certainly was no special issue on mental retardation included in the jury
charge. This evidence was relevant to the mitigation special issue. (14) If the applicant is
mentally retarded, it mitigates his moral culpability. And, just because the jury answered
the mitigation special issue "no" is not the equivalent of a jury finding that the applicant is
not mentally retarded. Also the claim that the applicant "filed" a coherent pro se brief on
direct appeal from his 1985 conviction does not necessarily support the conclusion that the
applicant is not mentally retarded. It is common knowledge that there are "writ writers" in
TDCJ who will write pleadings for other inmates.

 While there may be some evidence to the contrary, there is significant evidence that
the applicant is mentally retarded. The record supports the trial court's finding that the
applicant is mentally retarded. The same trial judge who presided over the applicant's two
trials made the findings and conclusions in this case. That trial judge was in the best
position to evaluate conflicting evidence, and his findings deserve great deference.

 In fact, it is not surprising that the trial judge found that the applicant was mentally
retarded in this case. While Penry was pending before the United States Supreme Court,
the applicant filed a subsequent application for a writ of habeas corpus. He claimed that he
is mentally retarded and that the execution of the mentally retarded violated the Eighth
Amendment to the United States Constitution. He also claimed that he was prevented from
having the jury consider his evidence of mental retardation in the context of the special
issues that were provided in the jury charge of his first trial. During those proceedings the
trial judge found that the applicant is mentally retarded. As part of his findings, the trial
judge said 

 At the punishment phase of his trial, petitioner did testify and was allowed to
present evidence of his mental retardation, brain damage, alcoholism, alcohol
consumption at the time of the offense and purported abuse he suffered as a
child. These matters were presented as mitigating factors of his punishment.
. . . [P]etitioner is mentally retarded.

The trial court's finding has not changed.

 We filed and set that application and granted relief on the basis of Penry error. (15) In
our unpublished opinion disposing of the case, we quoted Kartye's testimony from the
punishment phase of the applicant's 1985 trial. He said that "even under repeated testings
in optimal conditions, his score would fall in the mentally retarded range." (16) After we
discussed the Supreme Court's opinion in Penry and how evidence of mental retardation
presents a "double-edged sword, we said, 

 Mr. Modden's evidence of mental retardation presented the same problem. 
Even as a rational jury might have found that appellant's mental condition
made him less blameworthy, they were required to express their
consideration of his mental condition in a way that would cause him to
receive the ultimate sanction. The second special issue simply did not
provide the jury with a way to give effect to mitigating evidence of mental
retardation in this case. (17)

This Court has previously concluded that the applicant presented evidence of mental
retardation at his 1985 trial.

 We want to make clear that the parties' attempt to strike a plea bargain regarding the
applicant's status as a mentally retarded person has no bearing on the outcome of this case. 
The trial court found, long before any agreement between the parties, that the appellant is
mentally retarded. Our decision today is based solely on the trial court's findings, which
are supported by the record. 

 We conclude that the record supports the trial court's findings that the applicant is
mentally retarded. As a result, we grant relief. We reform the applicant's sentence to life
imprisonment in the Texas Department of Criminal Justice Correctional Institutions
Division. 

Delivered: April 21, 2004.

Publish.
1. Modden v. State, 721 S.W.2d 859 (Tex. Crim. App. 1986).
2. Ex parte Modden, No. 71,312 (Tex. Crim. App. delivered Feb. 12, 1992) (not designated
for publication); see Penry v. Lynaugh, 492 U.S. 302, 328 (1989) (holding that jurors that are
considering the death penalty must have a vehicle to give effect to their reasoned moral response to the
defendant's mitigating evidence).
3. Modden v. State, No, 71,493 (Tex. Crim. App. delivered June 8, 1994) (not designated for
publication).
4. Ex parte Modden, No. 11,364-04 (Tex. Crim. App. delivered July 1, 1998) (not designated
for publication).
5. Atkins v. Virginia, 536 U.S. 304, 321 (2002).
6. Modden v. Texas, 536 U.S. 954 (2002).
7. While this case was on remand to the trial court, the State and the applicant made an
agreement that, in exchange for not challenging the applicant's claim that he is mentally retarded, the
applicant would plead guilty to five offenses: aggravated assault with a deadly weapon (1976), arson
(1985), deadly weapon in a penal institution (1987), deadly weapon in a penal institution (1992), and
retaliation (1992). The State agreed to stipulate that the applicant is mentally retarded and present to
the trial court agreed proposed findings of fact and conclusions of law on the remand from this Court. 
And the State filed a motion in the trial court to reform the applicant's sentence. Our holding in this
case is not based on the agreement or the motion.
8. Atkins, 536 U.S. at 321.
9. The Supreme Court quoted the AAMR definition of mental retardation in Atkins:

 

 Mental retardation refers to substantial limitations in present functioning. It is
characterized by significantly subaverage intellectual functioning, existing concurrently
with related limitations in two or more of the following applicable adaptive skill areas:
communication, self-care, home living, social skills, community use, self-direction,
health and safety, functional academics, leisure, and work. Mental retardation manifests
before age 18.


Id. at 308 n.3 (quoting Mental Retardation: Definition, Classification, and Systems of
Supports 5 (9th ed. 1992)).
10. The Supreme Court quoted the APA of mental retardation in Atkins:


 The essential feature of Mental Retardation is significantly subaverage general
intellectual functioning (Criterion A) that is accompanied by significant limitations in
adaptive functioning in at least two of the following skill areas: communication,
self-care, home living, social/interpersonal skills, use of community resources,
self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).
The onset must occur before age 18 years (Criterion C). Mental Retardation has many
different etiologies and may be seen as a final common pathway of various pathological
processes that affect the functioning of the central nervous system. "Mild" mental
retardation is typically used to describe people with an IQ level of 50-55 to
approximately 70.


Ibid. (quoting American Psychiatric Association, Diagnostic and Statistical Manual of
Mental Disorders 41, 42-43 (4th ed. 2000)) (citations omitted).
11. Ex parte Briseño, No. 29,819-03, slip op. at 11 (Tex. Crim. App. delivered Feb. 11,
2004).
12. The additional factors adopted in Briseño include the following:



 Did those who knew the person best during the developmental stage-his family,
friends, teachers, employers, authorities-think he was mentally retarded at that
time, and, if so, act in accordance with that determination?


 


 Has the person formulated plans and carried them through or is his conduct
impulsive?


 


 Does his conduct show leadership or does it show that he is led around by
others?


 


 Is his conduct in response to external stimuli rational and appropriate,
regardless of whether it is socially acceptable?


 


 Does he respond coherently, rationally, and on point to oral or written
questions or do his responses wander from subject to subject?


 


 Can the person hide facts or lie effectively in his own or others' interests?


 


 Putting aside any heinousness or gruesomeness surrounding the capital offense,
did the commission of that offense require forethought, planning, and complex
execution of purpose?



Briseño, No. 29,819-03, slip-op at 12.
13. Although Kartye did not use the term mildly mentally retarded in his report, the facts
discussed in the report indicate that the applicant has significant subaverage general intellectual
functioning concurrent with deficits in adaptive functioning that manifested before age 18. This report is
evidence of mental retardation and was admitted during the 1985 trial.
14. The mitigation special issue asks the jury "[w]hether taking into consideration all of the
evidence, including the circumstances of the offense, the defendant's character and background, and
the personal moral culpability of the defendant, there is sufficient mitigating circumstance or
circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." 
Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).
15. Ex parte Modden, No. 71,312 (Tex. Crim. App. delivered Feb. 12, 1992) (not designated
for publication).
16. Id., slip op. at 2.
17. Id., at slip op. at 2-3.